IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                         Plaintiff,

        and

JEFFREY WILLIS,

                 Plaintiff-Intervenor,

        v.

STOUGHTON TRAILERS, LLC,

                         Defendant.

OPINION AND ORDER

08-cv-748-slc

---

In April 2004, plaintiff-intervenor Jeffrey Willis, who is deaf, applied for a job as an assembler at defendant Stoughton Trailers, LLC's trailer manufacturing plant in Stoughton, Wisconsin. After two meetings with Willis, Stoughton Trailers determined that there were no accommodations that it could offer Willis that would allow him safely and efficiently to perform all of the tasks required of its assemblers. As a result, Stoughton Trailers did not offer Willis a job. Willis believed this was a discriminatory decision and sought relief. Agreeing with Willis, the Equal Employment Opportunity Commission has filed this lawsuit against Stoughton Trailers contending that the company violated the Americans with Disabilities Act. Willis then intervened.

Stoughton Trailers has moved for summary judgment pursuant to F.R. Civ. Pro. 56 (*see* dkt. 53), and having considered the parties' evidence and arguments, I am granting the motion. The EEOC has failed to adduce evidence from which a jury could find that Willis could perform the "buck and shoot" function on the assembly line, with or without accommodation. Additionally, the EEOC has failed to adduce evidence of any reasonable accommodation that

would allow Willis to perform a safety-related job function that required assemblers to hear bells, alarms and verbal communication.

From the parties' proposed findings of fact, I find the following facts to be undisputed for the purpose of deciding Stoughton Trailer's motion:[1]

## FACTS

Defendant Stoughton Trailers, LLC, is a manufacturer of semi-truck trailers, including customized trailers. The events relevant to this lawsuit occurred in early 2004 when the company was enjoying a boom in production. At that time, Stoughton Trailers's primary facility was Plant 6, which, together with adjoining Plant 5, encompassed approximately 600,000 square feet (not quite fourteen acres) and ran four assembly lines, each of which was approximately 800 feet long and had 10-12 assembly stations. At many of these stations, assemblers worked on two trailers located side-by-side with about a 10-foot space between the trailers, which typically were 28-53 feet long and 13'6" high. The trailers moved nose-to-tail down the assembly line, creating four long, 10-foot wide alleys. During a typical eight-hour shift, a fully-staffed line could manufacture 15 to 20 trailers; in 2004, Plant 6 was manufacturing up to 200 - 250 trailers each week.

Plant 6 had multiple overhead and jib cranes that maneuvered completed trailers and components throughout the building. The cranes were equipped with flashing lights, alarms or

---

[1] Some of plaintiff's responses to defendant's proposed findings of fact are marbled with argument, opinion, and even case citations. *See*, *e.g.*, Plt.'s Opp. to Def.'s PFOF, dkt. 62, ¶¶ 19, 20, 22, 30, 35 *etc*. Unless plaintiff proposed a specific fact supported by a citation to admissible evidence that contradicted the fact proposed by defendant, I have deemed the fact undisputed. *See* Procedure to be Followed on Motions for Summary Judgment, Section II C. and D.4.

sirens that would notify the assemblers when the crane was operating.  In addition to these warnings, certain assembly workers were designated as "spotters" to warn employees through verbal commands of approaching dangers.  The plant was very noisy, so all assemblers wore ear protection.

Cranes were not the only motorized equipment operating in Plant 6:  approximately 23 forklifts and a number of motorized golf carts operated constantly to transport various components and supplies throughout the production areas.  Although there were designated pathways in the primary aisles for the forklifts and golf carts, these vehicles moved into all areas of the production facility, including the workspaces occupied by the assemblers.  Like the cranes, these vehicles were equipped with flashing lights and horns to warn assemblers as they approached, warnings that were utilized frequently because of the many blind corners and narrow passageways around the areas where assemblers worked.  Sometimes during crane operation assembly workers were designated as spotters to warn employees through verbal commands of approaching dangers.  Because of the continual motion in the production environment, assemblers constantly had to be aware of the surrounding environment and of potential dangers.

Assemblers at Stoughton Trailers were cross-trained in all aspects of the trailer manufacturing process and rotated throughout the assembly process during a shift.  An assembler performed work in a variety of positions on the assembly line, including inside, under, adjacent to and on top of the trailers.  Much of their work was aloft on ladders, lifts, and scaffolding which generally were designed for only one person.  The majority of an assembler's work was

performed using two hands, they often held tools or materials, and they frequently worked beyond arms' reach of other assemblers.

Assemblers were required to work in pairs, such as during a task known as the "buck and shoot," which involved two assemblers riveting on either side of a trailer wall, or when installing a roof on a trailer. Because the assemblers were unable to see each other while performing the buck and shoot, they communicated by pounding on the sides of the trailers or by yelling.

Because of the trailer customization process, unique problems often arose on the assembly line. Stoughton Trailers required its assemblers to troubleshoot these problems and to relieve bottlenecks on the line, tasks that required substantial flexibility, speed and communication skills.

In early 2004, Stoughton Trailers ramped up its production and added several hundred assembly positions. The "Assembler B" written job description required assemblers to be able to "[p]erform all assigned tasks in a safe, efficient, timely, accurate and highly productive manner according to company policy;" "work and communicate in a team environment;" and have the "ability to hear bells, alarms and all verbal communication."

In April 2004, plaintiff-intervenor Jeffrey Willis applied to Stoughton Trailers for an Assembler B position in Plant 6. Willis, who is profoundly deaf, communicates by American Sign Language, gestures and body language. Willis has rudimentary writing skills. In high school Willis worked four or five months for a steel company in Harvard, Illinois, where he drove a fork lift, cut steel and worked a machine that bent pipe. Willis had technical school training in auto bodywork, diesel mechanics and a technical college diploma in auto mechanics. Between 1989 and 2004, Willis had worked as a maintenance worker at Page Avjet in Minneapolis, as

4

an assembler and mechanic at the U.S. Navy Weapons Station, as an installer (mechanic) for Sears Automotive in Louisville, a maintenance technician for Inertial Airline Services in Louisville,  and a clerk/mail handler for the U.S. Postal Service in Madison, Wisconsin.

After receiving Willis's application, Sarah Stormer, a recruiter in Stoughton Trailers's Human Resources Department, arranged an interview.  On April 16, Willis came to the Plant 6 facility with his sister-in-law, Jelaine Olsen, who served as an interpreter.  During the nearly two-hour interview, Stormer and Willis discussed Willis's employment history, the job description and benefits of the assembler position, the methods Willis used to communicate with others and the methods by which assembly workers in Plant 6 communicated during the manufacturing process.  Willis's interview included a tour of the plant, which was not in production at the time.

After not hearing from Stoughton Trailers for more than a week, Olsen called Stormer to check the status of Willis's job application.  Stormer responded that Kate Schieldt, the company's Human Resources Director, was responsible for the hiring decision.  On April 30, 2004, Olsen called Schieldt, who reported that Stoughton Trailers was still reviewing Willis's application but that it had concerns about his ability to work safely at Plant 6 and to communicate with others on the manufacturing floor.

Stoughton Trailers invited Willis back for a second interview and plant tour on May 28, 2004.  The interview was conducted by Schieldt and Bob Brown, the company's Safety Manager.  Willis was accompanied by his brother, Basil Willis.  During a tour of Plant 6, which was operating at the time, Schieldt and Brown asked Willis for suggestions as to how he could work safely in the Plant 6 manufacturing environment and how Stoughton Trailers could

accommodate his disability.   Willis and his brother suggested possible accommodations, including: 1) having Willis work only on the brakes and tires in a different area; 2) assigning Willis to only one area of the plant; 3) using lights as signals; 4) using notepads to communicate; and 5) tapping on shoulders and using sign language or gestures to communicate.

After this interview, Schieldt discussed with Brown possible accommodations for Willis. Schieldt considered accommodations such as adding flashing lights to moving hazards, tapping Willis to get his attention, using flashlights or a system of hand signals to communicate, and adding more mirrors to the facility, but determined that none of them would be sufficient to warn Willis of all of the safety hazards.  Schieldt further determined that allowing Willis to work in just one area of Plant 6 was not feasible because limited duty positions were not available, the assembler position required rotation among the various functions of the job, and single-area placement would have put Willis at a higher risk for a repetitive-stress injury.  Schieldt concluded that Willis would not be able to safely and efficiently perform the duties of an Assembler B, including the duties and requirements of hearing and engaging in verbal communication, hearing warning sounds used to alert workers of safety hazards and rotating among the various job duties along the assembly line.  Accordingly, Stoughton Trailers did not offer Willis the job.

Beginning in 2005, Stoughton Trailers instituted numerous improvements and lean manufacturing changes to its production facility.  These changes included establishing designated aisles for forklift and golf cart traffic that are located around the perimeter of the facility, reducing the number of assembly lines from four to two, moving the trailers down the line

6

sideways rather than nose-to-tail, installing computers containing design specifications at every workstation and reducing the amount of manpower required for material handling.

Because of the national economic downturn, Stoughton Trailers has reduced its trailer production to about 60 a week in early 2010 when the instant motion was filed.

OPINION

The Americans with Disabilities Act provides that a covered employer shall not "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). "Discrimination" under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business." § 12112(b)(5)(A). To establish a failure to accommodate claim under the ADA, a plaintiff must show that: (1) he is a "qualified individual with a disability"; (2) the employer was aware of his disability; and (3) the defendant failed to reasonably accommodate his disability. *Gratzl v. Office of Chief Judges*, 601 F.3d 674, 678 (7th Cir. 2010).

The parties agree that Stoughton Trailers knew that Willis was deaf when it declined to hire him. Stoughton Trailers contends, however, that Willis is not a "qualified individual with a disability." A qualified individual with a disability is someone who (1) satisfies the requisite skill, experience, education, and other job-related requirements of the sought-after employment position, and (2) can perform the essential functions of the desired position, with or without reasonable accommodation. 29 C.F.R. § 1630.2(m); *Gratzl*, 601 F.3d at 679; *Budde v. Kane County Forest Preserve*, 597 F.3d 860, 862 (7th Cir. 2010). Stoughton Trailers contends that the

EEOC has adduced no evidence to show that, with or without accommodation, Willis was able to perform these essential duties of the job of assembler: (1) rotate between the various job functions performed by an assembler, including the "buck and shoot" function; (2) communicate with co-workers; and (3) hear bells, alarms and other verbal communications.  Alternatively, Stoughton Trailer contends that Willis was not qualified because he posed a direct threat to his own health and safety or that of others.

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court must construe all facts and inferences in favor of the nonmoving party; however, this does not extend to drawing inferences supported only by speculation or conjecture: the nonmoving party must do more than raise some metaphysical doubt as to the material facts.  It must come forward with specific facts showing that there is a genuine issue for trial, that is, that sufficient evidence exists favoring t he nonmoving party that would permit a jury to return a verdict for that party. *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008).

## I.  Job Rotation

An employer's understanding of the essential functions of the job is presumed to be correct unless the plaintiff offers sufficient evidence to the contrary.  *Gratzl*, 601 F.3d at 679. Further, an employer may specify, for legitimate reasons, multiple essential duties for a position, and when an employee is expected to rotate through duties, he will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform

its essential duties.  *Id.; see also Basith v. Cook County*, 241 F.3d 927, 928-29 (7th Cir. 2001).  In support of its contention that rotation through all jobs on the assembly line was an essential duty of an assembler, Stoughton Trailers has submitted a declaration from Robert Wahlin, its Vice President of Operations, who testified to that fact.

Citing *EEOC v. Target Corp.*, 460 F.3d 946 (7th Cir. 2006), the EEOC responds that such a "mere statement" is not evidence and is insufficient to carry Stoughton Trailers's burden on summary judgment.  EEOC's Br. in Opp., dkt. 61, at 20.  But *Target* does not advance the instant analysis because it is legally and factually distinguishable.  In *Target*, the court found that, after the EEOC had presented a prima facie case of disparate treatment by the defendant, the defendant had failed to meet its burden of showing a legitimate, non-discriminatory reason for its decision when all it offered was a statement that "[b]ased upon [his] interview, Target decided that [Daniels] did not meet the requirements for an ETL position, and therefore elected not to hire him as an ETL."  *Id.* at 958.  The court explained that Target had failed to give enough detail to allow the EEOC to muster evidence establishing pretext.  *Id.*

As a preliminary observation, the *McDonnell Douglas*'s burden-shifting analysis at issue in *Target Corp.* is not applicable here.

More to the point and contrary to the EEOC's implication that Stoughton Trailers has provided no more than an opaque headline, Wahlin submitted a 53 paragraph affidavit (dkt. 56, Exh. 21) outlining plant layout, the trailer assembly process, and assembler job responsibilities, including some reasons for requiring station rotation, *id.* at ¶¶ 27-28.  The EEOC does not argue that Wahlin did not make his affidavit on personal knowledge or was otherwise unqualified to

testify regarding Stoughton Trailers's understanding of the essential functions of the assembler position.

Further, Wahlin's sworn statement that job rotation was an essential function of the assembler job is corroborated by the written job description, which provides that an assembler was expected to "[p]erform all assigned tasks in a safe, efficient, timely, accurate and highly productive manner according to company policy." The employer's judgment and the written job description are relevant to deciding which functions of a job are essential. 20 C.F.R. § 1630.2(n)(3)(I); *see also* 42 U.S.C. § 12111(8) ("[I]f an employer has prepared a written description . . ., [it] shall be considered evidence of the essential functions of the job.").

In an apples-to-oranges rebuttal attempt, the EEOC points out that Stoughton Trailers allows injured workers temporarily to forego working at certain workstations if the work exceeds their physical restrictions. It is well-settled, however, that providing a temporary exception to otherwise-mandatory job rotation for employees recovering from injuries does not render rotation "non-essential" or give rise to an obligation to similarly accommodate a non-injured but disabled employee. *Gratzl*, 601 F.3d at 678 ("[E]ven if the court continued the practice of temporarily reassigning court reporters to the control room, we have already noted that this would not create an obligation that it accommodate Gratzl with a permanent control-room position"); *Watson v. Lithonia Lighting*, 304 F.3d 749, 751 (7th Cir. 2002) (plaintiff's contention that she should be permanently assigned to light-duty position reserved for injured workers "would simultaneously increase the incidence of workplace injury and diminish the employer's ability to accommodate employees who have transient conditions"); *Winfrey v. City of Chicago*, 259 F.3d 610, 616 (7th Cir. 2001) (creation of modified position for plaintiff did not

10

demonstrate that four duties he performed were only essential duties of unmodified job that plaintiff sought); *Basith*, 241 F.3d at 930 (refusing to punish employer for going beyond requirements of ADA by requiring employer to maintain more unnecessary accommodation).

Even the EEOC's expert, Kevin Schutz, agreed that "[j]ob rotation is a key component in the Stoughton Trailer's plant."  Dkt. 68, Exh. 2, at 7.  In short, the EEOC has adduced no evidence from which a jury could conclude that job rotation was not an essential component of the assembler's job.

Further, Schutz found that a deaf person would be unable to rotate through all of the positions in the plant without accommodation.  In particular, he opined that a deaf person would be *unable* to perform the "buck and shoot" function, performed by two assemblers working as a team without the ability to see each other or communicate non-verbally.[2]  This alone might be sufficient evidence that Willis is not a qualified individual. *See, e.g., Dargis v. Sheahan*, 526 F.3d 981, 986-87 (7th Cir. 2008)(plaintiff's inability to rotate through the various required positions of the correctional officer's position means that he cannot perform the essential functions of that job).

Not so fast, rejoins Schutz: Stoughton Trailers could have accommodated Willis by having someone else take his place on the buck and shoot.  *Id*.  But assigning someone else the essential duties of a position is not a reasonable accommodation under the ADA.  *Peters*, 311

---

[2] As the EEOC points out, Schutz offered this opinion without having observed the buck and shoot function on the day he toured Stoughton Trailers's plant.  Dkt. 61 at 7.  However, the EEOC presents no evidence  that Schutz misunderstood how an assembler would have to perform this function.  And what does it say about the EEOC's evidence when it must impeach its own expert on a fact material to proving that Willis was qualified to be an assembler?  The Seventh Circuit won't even second-guess a defendant employer's judgment as to the essential functions of its jobs, *see Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002).

F.3d at 845-846 (having someone else do heaviest lifting for plaintiff if he could not handle it was unreasonable accommodation because it required another person to perform essential function of plaintiff's job); *Hansen v. Henderson*, 233 F.3d 521, 523-24 (7th Cir. 2000) (employer need not create new job or provide helper as accommodation to disabled employee); *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022  (7th Cir.1997) ("to accommodate him [the employer] would have to hire someone else to help perform some duties. That clearly was beyond a reasonable accommodation."); *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) ("hiring a helper to perform the overhead work would mean the helper would de facto perform [the] job. We cannot agree that [an employee] would be performing the essential functions of his job with a helper.").

 In spite of Schutz's suggestion that Stoughton Trailers could have accommodated Willis by exempting him from the buck and shoot, the EEOC attempts to argue that there is evidence from which a jury could find that Willis could perform the task even *without* accommodation. In its brief, dkt. 61 at 21, it cites to the deposition testimony of Stoughton Trailers's expert, Jay Kappelusch, wherein he stated that he did not "see any immediate pressing safety hazard [associated with the buck and shoot] that would put a deaf individual in any more or less risk than an otherwise healthy person." Dep. of Jay Kappelusch, Dec. 21, 2009, dkt. 69, at 99.  But the EEOC is taking this statement wholly out of context: Kappelusch was not opining whether Willis could perform the buck and shoot without accommodation, he was discussing safety hazards, explaining the basis for his own opinion that the production environment as it existed at Stoughton Trailers in 2004 was too hazardous to accommodate a deaf individual.  In Kappelusch's opinion, the buck and shoot itself was not particularly dangerous; it was the

12

facility's lack of dedicated pathways for material handling, compounded by sight lines that were

blocked by trailers and poor lighting, that created an environment where a person needed to be

able to hear in order to receive adequate verbal warning of approaching dangers. *Id*. at 99-100.

Later in his deposition, Kappelusch made clear that Willis could not perform the buck

and shoot function:

> [The buck and shoot] is something that I think [Schutz] would
> agree is not something you can accommodate in to. The reason
> being, you have no line of sight, which he acknowledges, at all.
> And you have no means of hearing or seeing anything. The way
> the workers communicate is they pound. They have a system of
> pounding on the side of the walls. And they use that auditory
> signal to tell them whether they need to move up, move down, hit
> the rivet again. Okay? I'm not aware of any accommodation
> that's going to facilitate this operation. And that's reasonable.
> Not everything is accommodatable. That's just fact.
>
> *Id*. at 174.

As noted above, Schutz did not disagree that Willis was incapable of performing the buck

and shoot and Schutz did not suggest that the function was not essential to the job of an assembler;

to the contrary, he suggested that Stoughton Trailers could have accommodated Willis by

excusing him from this duty. As a matter of law, however, this suggestion was unreasonable.

When the only accommodation the employee suggests is unreasonable, he fails to meet his

burden under the ADA. *Gratzl*, 601 F.3d at 680.

Accordingly, the EEOC has failed to adduce evidence from which a jury could conclude

that Willis could perform all of the various tasks required of an assembler with or without

accommodation or that job rotation is not an essential function.  Therefore, defendant is entitled to summary judgment.[3]

## II.  Ability to Hear Bells, Alarms and Verbal Communications

Stoughton Trailers also contends that the EEOC has failed to adduce facts showing that any reasonable accommodation existed that would have allowed Willis to perform the essential function of hearing bells, alarms and verbal communications that were used to warn assemblers of approaching dangers, including overhead crane movement and approaching forklifts.  This argument could be viewed as the flipside of Stoughton Trailers's claim that as a result of his inability to hear such warnings, Willis posed a "direct threat" to his own health and safety or that of others than could not be eliminated by any reasonable accommodation.  To prevail on its essential function argument, Stoughton Trailers must establish that the ability to perceive aural warnings and communicate verbally are essential job functions for which there are no reasonable accommodations; to prevail on its direct threat argument, Stoughton Trailers must prove that Willis's inability to perceive aural warnings or to communicate verbally render him a direct threat to safety.  Despite the significant overlap of these arguments, it seems that the undisputed facts currently in the record establish Stoughton Trailer's essential function argument but do not suffice to prove its direct threat argument.

---

[3] In light of the conclusion that no reasonable accommodation existed that would have allowed Willis to perform the buck and shoot function, it is unnecessary to address the EEOC's claim that Stoughton Trailers failed to engage in the "interactive process" required by the ADA. *Mays v. Principi*, 301 F.3d 866, 870 (7th Cir. 2002) ("[W]hen no reasonable accommodation is possible the failure to jaw about accommodation is harmless.").  I note, however, that the EEOC's stridency on this point is misdirected in light of Stoughton Trailers having invited Willis back for a second interview directly with its HR Director and as part of a plant tour invited Willis and his brother to suggest accommodations.

Let's deal with the "direct threat" argument first.  An employee is not a qualified individual under the ADA if he poses "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." *Branham v. Snow*, 392 F.3d 896, 905-06 (7th Cir. 2004) (quoting 29 C.F.R. § 1630.2(r)).  The assessment of risk "must be based on medical or other objective evidence" and the determination that a significant risk exists must be objectively reasonable.  *Bragdon v. Abbott*, 524 U.S. 649-50 (1998).  To determine whether a risk is significant, the employer must consider: (1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood that the potential harm will occur, and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2r); *see also Emerson v. Northern States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001).  The "direct threat defense must be 'based on a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence,' and upon an expressly 'individualized assessment of the individual's present ability to safely perform the essential functions of the job' . . . ." *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2r).

In general, the employer bears the burden of proving that an employee posed a significant risk that could not be eliminated by a reasonable accommodation.  *Branham*, 392 F.3d at 906-07 (citing *Dadian v. Village of Wilmette*, 269 F.3d 831, 841 (7th Cir. 2001)).  Even so, "[t]here may be some instances in which there is an overlap of the question whether an employee can perform the essential functions of a job and the question whether he or she is a direct threat." *Hammel v. Eau Galle Cheese Factory*, 2003 WL 21067091, *11 (W.D. Wis. 2003).  This appears to be such a case, insofar as  Stoughton Trailers's contention that Willis cannot perform the

15

essential function of hearing bells, alarms and verbal communication overlaps with its claim that Willis posed a direct threat. Although some courts place the burden on plaintiff in this situation, *see, e.g.*, *EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997) (where essential job functions necessarily implicate safety of others, it is plaintiff's burden to show that she can perform those functions in way that does not endanger others), in this circuit, Stoughton Trailers has the burden of proving that the question of Willis's direct threat is so one-sided that no reasonable jury could find for Willis. *Branham*, 392 F.3d at 907 & n.5 (surveying the cases).

The parties do not dispute that Willis's profound deafness is a permanent, immutable condition that cannot be alleviated or mitigated with the use of any personal corrective measures such as hearing aids. It is undisputed that at Stoughton Trailers' Plant 6 in 2004, an assembler's line of sight often was blocked by the line of trailers moving tail-to-nose down the production line, and by the various blind alleys and corners in the facility. According to Stoughton Trailers, this lack of sight lines and the constant movement of materials throughout the plant by different means, including cranes and forklifts, meant that audible communication and audible warnings often were necessary to ensure worker safety.

Then, contrary to the EEOC's contention, Stoughton Trailers conducted an "individualized assessment" before rejecting Willis's application: it invited Willis to tour the plant and to make suggestions on how he could be accommodated, and it considered those suggestions and other possibilities before concluding that no reasonable accommodation existed that would allow Willis to work safely in Plant 6. Schieldt determined that having other employees warn Willis by tapping him, gesturing or shining a flashlight in his eyes would be ineffective because assemblers did not always work within arm's length of each other and because

16

there would be no guarantee that another assembler would notice that Willis was in danger or that he would see the warning. In addition, Stoughton Trailers's forklifts and cranes were already equipped with flashing lights, but those did not provide an effective warning in the many blind spots where the assemblers often worked. There is no support in the record for the EEOC's assertions that Stoughton Trailers "rigidly assumed" that speaking was the only way to communicate in Plant 6 or that it "ignored the methods proposed by Willis in 2004" to accommodate his disability. *See* dkt. 61, at 18.

The EEOC argues that Stoughton Trailers overstates the extent to which auditory warnings were required. It points out that the plant was very noisy, all assemblers wore ear protection, and the cranes and forklifts were equipped with flashing lights to provide a visual warning to the employees on the production floor. While the EEOC has not persuaded the court that Stoughton Trailers has overstated the extent to which auditory warnings were required, I agree with the EEOC that Stoughton Trailers has not submitted sufficient supporting evidence on this point for Rule 56 purposes to establish the absence of a disputed fact on Stoughton Trailer's direct threat argument.

Put another way, although one reasonable inference from the objective evidence is that a profoundly deaf assembler would pose a significant and insufficiently remediable risk of substantial harm to his own safety (and maybe the safety of others), it's not such an exclusive inference on this record that defendant is entitled to summary judgment on it. As the party with the burden of proof on this issue at trial, Stoughton Trailers must establish affirmatively the lack of sufficient evidence favoring the EEOC for a jury to return a verdict rejecting the direct threat

17

defense, namely that the evidence of direct threat is so one-sided that no reasonable jury could find for Willis and the EEOC. *Branham*, 392 F.3d at 907.

Stoughton has presented objective evidence outlining the myriad hazards confronting assemblers in Plant 6, but how would a jury account for the EEOC's arguments about other workers wearing ear protection, and Plant 6's use of visual warnings?  Is such evidence sufficient to reduce the safety risk from "significant" to something less? *See Branham*, 392 F.3d at 906 (when considering a direct threat defense, the key inquiry is not whether a risk exists but whether it is significant); *but see Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 662 (7th Cir. 2005)("where the plaintiff's medical condition is uncontrolled, of unlimited duration and capable of causing serious harm, injury may be considered likely to occur").  Although the evidence favors Stoughton Trailers, given the heavy burden confronting it on this argument, I cannot conclude that Stoughton Trailers is entitled to summary judgment on its claim of direct threat.

But that's just one side of the coin.  The other side is Stoughton Trailer's assertion that it was an essential function of the Assembler 2 position to be able "to hear bells, alarms and all verbal communication."  There is ample evidence that these skills were necessary to avoid the myriad hazards confronting assemblers in Plant 6. A single failure to hear the horn of an approaching forklift or a shout from a fellow employee warning that a 53-foot trailer was swinging overhead could lead to catastrophe.  The fact that Willis was able to work at a number of shop and factory jobs without incident before applying for the assembly job at Stoughton Trailers is of no moment: the EEOC presents no evidence that any of these previous work environments posed the same hazards as Plant 6.  *See LaChance v. Duff's Draft House, Inc.*, 146

F.3d 832, 835 (11th Cir. 1998) (argument that plaintiff performed job safely at other places was "unavailing" in absence of evidence that other jobs required using same kind of appliances); *cf. Darnell*, 417 F.3d at 662 (employee with health condition who has experienced no on-the-job episodes can still pose threat to workplace safety).  In sum, there is no question that the ability to perceive and process warnings quickly and adequately is an essential function of the Assembler B job; the question is whether some reasonable accommodation existed that would have qualified Willis for the position.

The EEOC does not appear to contend that any of the accommodations suggested by Willis would have reduced or eliminated the safety risk.  Instead, it focuses on the opinion of its expert, Schutz, as proof that reasonable accommodations existed.  In his report, Schutz suggested a number of accommodations that Stoughton Trailers could have implemented, including:  1) assigning plaintiff to a crew with consistent placement and one or more supervisors or lead employees who understand his limitations; 2) having a few supervisors and employees learn some sign language; 3) provide notepads to co-workers; 4) place additional lighting in Plant 6; 5) provide a sign language interpreter during the training process; and 6) provide electronic devices, such as a vibrating pager or a "personal digital assistant" to allow other employees to communicate with plaintiff.

Whether Schutz's opinion even would be admissible at trial is questionable.  He formed his opinion regarding the availability of accommodations after touring Plant 6 in October 2009, more than five years after Willis applied for the assembler job.  As the EEOC acknowledges, beginning in 2005, Stoughton Trailers began an overhaul of Plant 6 that changed traffic patterns, increased automation, eliminated movement of large objects around blind corners and

made it easier to move large objects into place.[4]   However, Schutz did not account for any of these changes when he assessed the feasability of accommodations that could have been made for Willis in 2004.  At his deposition, Schutz admitted that he did not know the traffic patterns of forklifts and golf carts in Stoughton Trailers's assembly plant in 2004, did not know if they entered the assemblers' work space, did not know how materials were delivered to the assemblers or how materials moved through the assembly lines and did not how the movement of door frames or rear assemblies was communicated to assemblers.  Absent such knowledge, his opinion is of little value.  *See generally Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (setting forth three-step analysis for addressing relevance and reliability of expert testimony).

Even assuming, *arguendo*, that Schutz's opinions are admissible, he failed to propose any reasonable accommodation that would have eliminated the threat posed if Willis had been allowed to work at Stoughton Trailers's facility in 2004.  Even after evaluating the arguably less-hazardous work conditions as they existed at Plant 6 in 2009, Schutz proposed that Stoughton Trailers could have accommodated Willis's deafness by assigning him a "key employee" who would "specifically check to see if [Willis] was in the area of risk or potential harm."  Dkt. 68, exh. 2, at 9.[5]  However, a recommendation that an employee be provided with another employee

---

[4] The EEOC implies that if Stoughton Trailers had made these changes sooner, it could have accommodated Willis.  *See* dkt. 61 at 23.  Perhaps this would have been true, but it's an analytical non sequitur: requiring a manufacturer to revamp its entire production process and plant setup in order to accommodate a deaf job applicant wouldn't qualify as "reasonable.".

[5] The EEOC asserts that Schutz testified that Willis could have worked safely with "minimal accommodations," such as notepads.  This assertion is not supported by Schutz's report or deposition testimony.  Central to Schutz's proposal was assigning Willis to a crew with consistent placement and having one or two supervisors or "lead employees" who understood Willis's limitations.  Nothing in Schutz's report or deposition suggests that he was of the view that merely providing Willis and other assemblers with notepads would have been enough to address the safety concerns raised by having Willis on the production floor.

20

to "check up" on him is not a reasonable accommodation. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 866-867 (7th Cir. 2005) ("Accommodations which require special dispensations and preferential treatment are not reasonable under the ADA, thus Davis's recommendation that Hammel be given special training and provided with a person to 'check' up on him does not qualify as a reasonable accommodation."); *Williams v. United Ins. Co. of America,* 253 F.3d 280, 282 (7th Cir. 2001) ("the employer is not required to give the disabled employee preferential treatment, as by giving her a job for which another employee is better qualified, or by waving his normal requirements for the job in question").  The unreasonableness of this proposal is all the more palpable in a huge, hazardous, fast-paced production environment like Plant 6 in May 2004.  Assigning an employee to shepherd Willis past the dangers in his daily shift probably would have slowed down the production process and might even have added novel safety risks to the shepherd.  *See Hammel*, 407 F.3d at 867 ("To be sure, the ADA does not require an employer to accommodate a disabled employee by making special, individualized training or supervision available in order to shepherd that employee through what is an essential and legitimate requirement of the job.").

Finally, the EEOC suggests that Stoughton Trailers should have accommodated Willis by hiring him and then trying different ways to accommodate his deafness before concluding that no reasonable accommodations existed.  The Seventh Circuit rejected this "try and see" approach in *Peters*, 311 F.3d at 846 ("[A] employer is not obligated to allow the employee to try the job out in order to determine whether some yet-to-be requested accommodation may be needed.").  *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568 (7th Cir. 2001), the case cited by the EEOC, is not on point.  In that case, the issue was whether the plaintiff, who was missing her left arm

21

below the elbow, was treated differently from non-disabled employees when she was denied the opportunity to be trained on a high-speed scanner, which was a non-essential function of her job. Ruling on the plaintiff's disparate treatment claim, the court found that there was evidence from which the jury could find that plaintiff was capable of running the high-speed scanner, contrary to the employer's determination that she would not be able to do so with only one hand. *Id*. at 573. As for the employee's failure to accommodate claim, however, the court made clear that if the plaintiff actually was found to be unable to operate the scanner by herself, the employer had no obligation to provide accommodations that would allow her to do so. *Id*. at 577. *Hoffman* provides no support for the notion that an employer making a new hire actually must try various accommodations before it may conclude that no reasonable ones exist. Given the hazards that existed in Plant 6 in 2004, the use of auditory warnings to alleviate those hazards and the substantial harm that could have resulted from a failure to hear a warning signal, Stoughton Trailers cannot be faulted for deciding not to "try and see" if there was set of accommodations that would allow Willis to work safely in Plant 6.

In sum, I conclude that there is no evidence from which a jury reasonably could conclude that reasonable accommodations existed that would have allowed Willis to perform the essential job function of hearing bells, alarms and verbal communications. Accordingly, Stoughton Trailers also is entitled to summary judgment on this ground.

ORDER

IT IS ORDERED that defendant Stoughton Trailers, LLC's motion for summary judgment, dkt. 53, is GRANTED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 22nd day of June, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge